[Civ. No. 53093. Second Dist., Div. Five. Dec. 20, 1978.]

BETTY STEINBERG, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent;
AMERICAN MAILING SERVICE, INC.,
Real Party in Interest and Respondent.

**COUNSEL**

Kenyon F. Dobberteen, Manuel Monguia and Sandra Pettit for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, John J. Klee, Jr., Assistant Attorney General, and Anne S. Pressman, Deputy Attorney General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

584

## Opinion

**STEPHENS, J.**—This appeal follows denial of a petition for writ of mandate.

Steinberg was employed by American Mailing Service for some period over four months prior to February 4, 1976, as a clerk-typist. On the 4th of February her employment ceased and the issue is whether she was terminated without cause or whether she "constructive voluntary quit."

Steinberg did not get along well with her coworkers; they, in the main, all being related to the employer, a Mr. Spero. The only person with whom she worked well was a Mrs. Wolf. This inability to work with the others resulted in Steinberg's withdrawal from any interaction with anyone other than Mrs. Wolf. On the 4th, however, one employee, who had some 10 years' experience in the company, approached Steinberg and mumbled something to her.[1] Steinberg continued working and did not respond. Mrs. Wolf injected a directive to Steinberg to respond to the other employee and Steinberg stated that she refused to talk to the employee because it adversely affected her health and made her ill. Mrs. Wolf reported this to Spero. He talked to Steinberg about the situation, then gave her the option of either speaking to the coworker or discontinuing her employment. Steinberg chose not to speak to the other employee.

▇▇▇ Did Steinberg's employment terminate under the doctrine of "constructive voluntary quit" as found by the administrative law judge, the California Unemployment Insurance Appeals Board and the superior court judge. The answer is in the negative.

Here the employer was aware that Steinberg was suffering from emotional stress and had taken time off for that condition. It was also known that Steinberg had not spoken to this coemployee for several months. On the 4th of February, 1976, however the ultimatum of converse or terminate was presented and Steinberg elected not to jeopardize her health by communicating, though she desired to remain an employee.

---

[1] At prior times the same employee had sought to give directions to Steinberg on how certain work was to be done which upset Steinberg greatly, purportedly due to or accentuated by the fact that Steinberg was in the menopause period of life.

■ It is conceded that the doctrine of constructive voluntary quit is an outgrowth of employment situations where a license or union membership is a necessity for employment. The doctrine was an expression of the *qualification* for continued employment. In such instances, though termination would appear to be the act of the employer; nevertheless, the terminated employee could not receive unemployment benefits. Steinberg does not quarrel with the proper application of the rule, quoting from Employment Development Department, Benefit Determination Guide, at VQ 135.14-1 (1976):

"A claimant is said to have constructively quit his job when, although discharged by the employer, the claimant himself set in motion the chain of events which resulted in the employer's *having no choice except to terminate him.*

"*All three of the following elements must be present before it can be said that a claimant has constructively quit his job.*

"1. *The claimant voluntarily committed an act which*

"2. *made it impossible for the employer to utilize his services,* and

"3. *the claimant knew or reasonably should have known the act would jeopardize his job and possibly result in the loss of his employment.*" (Italics in original.)

As we review the record here, items one and three of the criteria have been met. Not so the second.

■ The Unemployment Insurance Code sets out two general grounds for disqualifying a claimant for benefits: "An individual is disqualified for unemployment compensation benefits if the director finds that he [1] left his most recent work voluntarily without good cause or [2] that he has been discharged for misconduct connected with his most recent work." (Unemp. Ins. Code, § 1256.)

The termination of Steinberg's employment, though founded upon the doctrine of constructive voluntary quit, was found to be grounded upon the fact that she "voluntarily quit her job without good cause." In proper perspective, the constructive voluntary quit doctrine adds but one factor to prohibition of obtaining unemployment benefits after an employee,

without cause, quits. This added factor is the common sense recognition of the fact that where the employee has a choice of action in either complying with a reasonable requirement or terminate employment, the employer has the right to consider a refusal to comply an election to quit. Even though the employee maintains he is not *quitting,* his acts have *constructively* acted for him in the quitting.

Both sides here suggest that there are no court opinions on the subject. We disagree. As we analyze the problem, semantics have dimmed the issue. The same basic issue was considered in *Hildebrand* v. *Unemployment Ins. Appeals Bd.* (1977) 19 Cal.3d 765, 768 [140 Cal.Rptr. 151, 566 P.2d 1297]: "Plaintiff's employer, real party in interest Cel-A-Pak, Inc., appeals. (An employer, such as Cel-A-Pak, has a direct interest in the unemployment compensation benefits paid to former employees since such benefits are charged against the employer's account which is fed by the employer's contributions (§ 1026).) We will conclude that plaintiff properly was denied unemployment benefits because she had accepted employment with Cel-A-Pak with full knowledge of the Saturday work requirement. When she subsequently refused to perform such work, accordingly, she must be deemed to have left work voluntarily without good cause."

The question then remains whether the employer's order was reasonable.[2] A similar problem was addressed in *In the Matter of Marco Dragell,* Benefit Decision No. 4847 (1948) where a discharged employee contended that the conduct leading to the discharge did not amount to misconduct. There the California Unemployment Insurance Appeals Board stated: "In our opinion, the claimant's refusal to operate a jackhammer is not within the class of actions we have held to constitute misconduct. However, a worker who wilfully refuses to obey a reasonable order from a superior may expect that such refusal will result in his dismissal. Such action, we have held, is tantamount to a voluntary quit by the worker. In the instant case, therefore, we hold that the claimant constructively quit his employment voluntarily without good cause when he refused to obey a reasonable order he received from his foreman."[3] It is the voluntary placing of oneself outside the employable sphere which

---

[2]The cases of *King* v. *California Unemployment Ins. Appeals Bd.* (1972) 25 Cal.App.3d 199 [101 Cal.Rptr. 660] and *Thornton* v. *Department of Human Resources Dev.* (1973) 32 Cal.App.3d 180 [107 Cal.Rptr. 892], are relied upon by Steinberg. There the right to wear a beard was in question. It was held the employee had a constitutional right to wear his beard under the facts of that case. We have no like constitutional issue here.

[3]Steinberg argues, in seeking to void the doctrine entirely, that a different result would have been reached in *In the Matter of John E. McCoy,* Precedent Benefit Decision No.

determines whether the person has constructively voluntary quit. Section 1256.1 of the Unemployment Insurance Code codified one such "quitting." There, criminal custody constitutes quitting. There is no reason to raise a refusal to carry out a reasonable order or comply with a reasonable condition to the *level* of misconduct; it may well be only a *refusal to work under the reasonable rules imposed.* (See *Evenson* v. *Unemployment Ins. Appeals Bd.* (1976) 62 Cal.App.3d 1005 [133 Cal.Rptr. 488].)

 Applying the legal rules as we have expressed them to the facts of the instant case, we first observe an implicit finding that the "silent treatment" was detrimental to the running of the business involved. We also note that the "silent treatment" had been countenanced for at least four months prior to the instance of February 4th. The record is woefully short of establishing that coworker communication was an expected or required condition of employment. Nor is it clearly established that lack of coworker interaction really had any deleterious effect on the company as a whole. We meet the *reasonableness* aspect of the employer's order to indulge in verbal communication as an isolated order. Under such circumstances, we cannot conclude that the order was a reasonable one, and, hence, the employee did not voluntarily quit but, rather, was discharged. Misconduct not being applicable, the discharge entitled the employee to unemployment compensation.

The judgment is reversed.

Kaus, P. J., concurred.

**ASHBY, J.**—I respectfully dissent.

The basic question presented by this appeal is whether there is substantial evidence to support the finding that appellant is disqualified under Unemployment Insurance Code section 1256 in that she "voluntarily without good cause" left her most recent employment." The evidence and its inferences viewed most favorably to respondent support the decision of the lower court and the appeals board.

---

183 (1976) had the *constructive* doctrine been applied. Not so. There the board found that the order was an unreasonable one.

The cited case of *In the Matter of James Skinner,* Precedent Benefit Decision No. 192 (1976) is not in point, it merely holding that past misconduct does not constitute present discharge for cause. The case of *Silva* v. *Nelson* (1973) 31 Cal.App.3d 136 [106 Cal.Rptr. 908], is likewise inapposite. That court merely held that a single vulgar outburst would not constitute ground for discharge of misconduct.

Appellant was employed by American Direct Mailing Advertising for approximately four months. She was hired as a typist but took shorthand, typed letters, filing work, statements, typed envelopes, addressed labels, and anything else that was given to do. Soon after she took the job, she found it difficult to get along with her fellow employees. Most if not all of whom were related. Quickly appellant reached a point where she would not speak to anyone but the boss's sister, Mrs. Wolf and Mr. Spero, the boss.[1]

On what turned out to be her last day of employment, appellant was approached by an elderly 68- or 69-year-old coworker who, according to appellant, "started mumbling something to me, and I ignored her and continued my work." Mrs. Wolf told appellant that she had to answer her fellow worker. When appellant refused, Mrs. Wolf reported the incident to her brother, Mr. Spero. Mr. Spero inquired into appellant's reason for refusing to answer her coworker. Appellant testified as follows concerning her conversation with Mr. Spero:

"A. He said, 'You got to talk to her or else you can't work here anymore.'

"I can't remember the exact words, but that was the meaning, and I said, 'I can not and will not talk to anyone that makes me ill. My health is more important.' "

Although appellant insists she did not quit her job, she submitted into evidence a statement of handwritten notes which read as follows: "Also followed doctor's advice, given to me last year, *to remove myself* from any source of irritation and not to get involed [*sic*] in anything that affects my health. . . . [¶] Mrs. Wolfe is sister of Mr. Spero—her statement that I quit my job is not correct. Mr. Spero is the person to speak to because he is the one that terminated my employment. I didn't quit—*I had to leave that job because it affected my health."* (Italics added.)

---

[1] "However, there was a family unit of man and wife and the woman was pregnant and they thought she was the boss. She sat next to me and she annoyed me and was hostile and upset me very much.

"As a matter of fact you can check with the boss—had to take a week off in December because they made me so sick and aggravated me. So I made up my mind then and there I will not become involved in anyone, can not afford to be upset.

"Anyway, so I told Mrs. Wolf who gave me my work assignment, the boss's sister, and I says I will not bother with anyone. You give me my assignment. I work for you, and this is it."

It is clear that the record supports the finding that appellant was not discharged. She left voluntarily rather than speak to her coworkers. However, we must still consider whether the record supports a finding that her termination, though voluntary, was without good cause. It is clear that it does. Appellant presented no evidence to identify an illness caused by her employment. She was not treated by a doctor for her claimed illness. She conceded that she had not been advised by a doctor to terminate her employment. Under the rules of the appeals board, good cause will not be found if the employee has not been receiving medical attention relative to the medical problems complained of and/or where the termination was not necessitated on the advice of a physician. (Precedent Benefit Dec. Nos. 117 (1971), 5846 (1952), and 5343 (1949).) In regard to the nature of the illness she attributed to the presence of the employee involved in the final incident, appellant testified as follows:

"Q. Now, you mentioned that talking to this woman would make you ill?[2]

"A. Yes.

"Q. What was the nature of the illness?

"A. I don't know. That woman rubbed me the wrong way. She just upset me.

"Have you ever come across a certain person that just get bad vibrations that upset you for no reason? I don't know what there was about her.

"She was a woman about 68, 69, and she kept harping, 'I am here ten years.' "

The decision by the appeals board is certainly supported by the record in this case. Appellant could have spoken and communicated with her fellow workers and remained employed. She chose to leave because she believed that talking or associating with her fellow workers would be detrimental to her health. If she could have shown that it would be

---

[2]Actually, although appellant testified that talking to the employee made her ill, appellant apparently never did talk to her. She testified that she did not know what the woman had said to her to precipitate the incident. "A. I have no idea because I just ignored [sic] completely. I have ignored her for four months. All of a sudden she comes over, starts mumbling, and I just kept ignoring her."

detrimental to her health, it would have been good cause for voluntarily leaving employment. However, she did not show that it would have been detrimental to her health and therefore did not show good cause.

I would affirm the decision.